VERMONT VALLEY RAILROAD *v.* CONNECTICUT RIVER POWER COMPANY OF NEW HAMPSHIRE.

May Term, 1924.

Present:   WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed May 5, 1926.

*Corporation—Consolidation—Meetings—Responsibility of Consolidated Corporation for Negligence of Its Servants and Agents—Citizenship of Consolidated Corporation Formed from Corporations in Different States—Binding Effect of Judgment Against Consolidated Corporation—Rights and Liabilities of Consolidated Corporation—Consolidation Agreement—Provision as to Continued Identity of Constituent Corporations—Responsibility of Consolidated Corporation for Injury by Maintenance of Dam on River Between Two States—Place of Commission of Act Causing Injury—Charter Provisions—Courts—Jurisdiction—Place of Suit Against Consolidated Corporation for Injury Caused by Maintenance of Dam on River Between States of Constituent Corporations—Evidence—Charter and Consolida-*

---

NOTE—When this case was argued it was assigned to Mr. Justice Butler.   On February 17, 1926, it was re-assigned to Mr. Justice Slack. Mr. Justice Taylor took part in the disposition of it and concurred in the opinion as written, but deceased before the same was handed down.

*tion Agreement as Evidence of Liability Imposed—Railroads
—Construction of Operating Contract—Immaterial Evidence—Expenditures in Repairing Roadbed of Railroad as
Evidence of Extent of Damage Thereto.*

1.  Entity brought into existence by consolidation of two or more constituent corporations under authority of law of states creating them constitutes new corporation possessed of all necessary corporate attributes.

2.  Where new corporation is formed by consolidation of two or more constituent corporations under authority of law of states creating them, there being no statute to contrary, stockholders, directors, and officers of new corporation can hold meetings and transact business in each state concerned in its creation so as to bind corporation and its property everywhere.

3.  New corporation formed by such consolidation is responsible as a unit for acts and neglect of itself or its agents and servants.

4.  Such corporation is a citizen of each state of constituent corporations forming it, for purpose of jurisdiction, and process may be served upon it as upon domestic corporation in state where suit is brought.

5.  Judgment rendered against such corporation by court having jurisdiction will bind it everywhere.

6.  Where new corporation is formed by consolidation of New Hampshire corporation with Vermont corporation under authority of law of these states, new corporation in New Hampshire has all rights and is subject to all liabilities specified in charter granted by that state, and, in Vermont, has all rights and is subject to all liabilities specified in charter granted by that state, and in each state is answerable for its acts as a new corporation possessed of all essential corporate attributes.

7.  Legal status of such corporation is unaffected by provision in consolidation agreement relating to continued identity of existence of constituent corporations, since this would have continued for purposes specified without such agreement.

8.  Fact that such new corporate entity was designated in some parts of consolidation agreement as the consolidated "companies," *held* of no particular significance, as in other parts of agreement such entity is referred to in singular, as "it" and "company," and evident intention was to create a new corporation.

9.  Where new corporation was formed by consolidation of New

Hampshire corporation with Vermont corporation under authority of law of these states, and maintained and operated dam across river between such states so as to raise water to a considerable height above its natural channel and set it back in such a way as to cause injury to roadbed of railroad situated in Vermont, acts complained of were committed by new corporate entity, and not by its constituent corporations, and constituted single, indivisible whole, inseparable by boundary line between the two states, and may be treated as having been committed wholly in either state.

10. In such case, where charter granted by New Hampshire provided in express terms that if corporation in exercise of authority thereby conferred injured property situate either in that state or Vermont it should make compensation therefor, corporation in accepting charter accepted such obligations as an inseparable part of law of its being, and would be liable in that state for injuries resulting in either state, and cannot escape such liability on ground that neither Vermont charter nor laws of this State imposed a like burden.

11. Where new corporation was formed by consolidation of New Hampshire corporation with Vermont corporation under authority of law of these states, and maintained and operated dam across river between two states so as to injure roadbed of railroad in Vermont, such new corporation could be sued in Vermont, although provision imposing liability for such injuries was contained only in New Hampshire charter, for even though action predicated thereon be considered local in character, it falls within exception to rule governing situs of local actions, that when act is committed in one jurisdiction that causes injury to real property in another, action for such injury may be brought in either.

12. In action of tort against new corporation formed from consolidation of New Hampshire corporation with Vermont corporation to recover damages for injuries to roadbed of railroad in Vermont caused by maintenance of dam across river between Vermont and New Hampshire, *held* that Vermont court had jurisdiction of subject-matter.

13. In such action, exclusion of charter of New Hampshire corporation, imposing liability for injuries to railroad property in either that state or Vermont, and consolidation agreement, which were offered as tending to show liability of defendant

for injuries complained of, *held* error, in view of fact that liability imposed by New Hampshire charter could be enforced in either state.

14. Operating contract between owner of railroad and company operating it, whereby owner was to receive fixed sum semi-annually out of gross earnings and pay all above that amount, so far as necessary, to reimburse operating company for certain specified expenditures, including maintenance of road in good repair and condition for use, *held* to make loss occasioned by injuries to roadbed, through maintenance of dam by another corporation, fall on owner, and to give such owner right of action for such damages, where earnings above fixed payment were adequate to cover expenditures of operating company under such contract, to show which evidence of amount of earnings was admissible.

15. Fact that as between such railroad owner and such operating company or its assignee, assignee was required to make repairs, is immaterial on question of owner's right to recover for damages to its roadbed through maintenance of dam by third party, where owner was bound to reimburse assignee therefor, so far as earnings of road were sufficient for that purpose.

16. While proof of expenditures by assignee of such operating company, in repairing roadbed damaged by maintenance of dam by third party may not be basis for railroad owner's recovery in action against such third party, it was evidence tending to show extent of plaintiff's damage from defendant's acts.

ACTION OF TORT for recovery of damage from maintenance of dam by consolidated corporation on river between states of its constituent corporations. Plea, general issue. Trial by jury at the September Term, 1922, Windham County, *Chase, J.,* presiding. Verdict directed for defendant, and judgment thereon. The plaintiff excepted. The opinion states the case. *Reversed and remanded.*

*Stickney, Sargent & Skeels,* and *Arthur P. Carpenter, William B. C. Stickney* and *Walter S. Fenton* of counsel, for the plaintiff.

*McLellan, Carney & Brickley,* and *Curtis & Curtis* (of Boston, Mass.), for the defendant.

SLACK, J.    The plaintiff is a corporation organized and do-
ing business under the laws of this State.    It owns a line of rail-
road which runs southerly from the village of Bellows Falls to
the village of Brattleboro, and is built much of the way near the
west bank of the Connecticut River.    Some time prior to 1920
the defendant built a dam across this river south of the village
of Brattleboro, which it has maintained to the present time.    The
west end of such dam is in the town of Vernon, Vermont, and
the east end is in the town of Hinsdale, New Hampshire.    In
maintaining and operating such dam the water of the river has
been raised to a considerable height above the natural channel,
and set back upon and against the embankment of plaintiff's
roadbed.    The plaintiff claims, and alleges in its complaint, in
substance, that in the spring of 1920, by reason of defendant's
maintenance and operation of its dam as aforesaid the plaintiff's
embankments, fills, roadbed, and its construction of earth, rubble,
and masonry were washed out, carried away, and otherwise in-
jured and damaged, and its roadbed made defective and rendered
unsafe for travel, etc.    This suit is brought to recover com-
pensation for such injuries and consequential damages.    The
complaint contains two counts:    One based on the charter lia-
bility hereinafter referred to, and the other based on the com-
mon law liability.

The defendant accepted service of the writ, entered a gen-
eral appearance in the case, and took a trial by jury on the
merits.    At the close of plaintiff's evidence, the court, on motion
of defendant, directed a verdict for defendant, and rendered
judgment thereon.    The case is here on plaintiff's exceptions to
the exclusion of certain evidence offered by it, and to the grant-
ing of defendant's motion for a verdict.

The defendant is a corporate entity resulting from the con-
solidation of the Connecticut River Power Company, a corpora-
tion chartered and organized under the laws of this State (See
Act 201, Laws of 1902, as amended by Act 209, Laws of 1904,
and Act 340, Laws of 1906), and the Connecticut River Power
Company of New Hampshire, a corporation chartered and organ-
ized under the laws of New Hampshire (See Laws of New Hamp-
shire, Chapter 306, Laws of 1903, as amended by Chapter 244,
Laws of 1907, and Chapter 326, Laws of 1909).    The object of
the constituent corporations was identical, namely, the develop-
ment of the water power of the Connecticut River for commercial

26

purposes.   Each of the constituent corporations was authorized
to construct a dam or dams across the Connecticut River at any
point opposite the towns of Brattleboro and Vernon in this State,
south of the suspension bridge from Brattleboro to Chesterfield,
New Hampshire; and in most respects here material the powers
conferred and the limitations imposed by the charters of the re-
spective constituent corporations were, in effect,. the same.   The
same persons, some of whom resided in this State and others in
New Hampshire, constituted a majority of the incorporators of
each of the constituent corporations.   The charter of each con-
stituent corporation contained the following provision:

> "This corporation may merge and consolidate its capital
> stock, franchise and property with, and may acquire the
> capital stock, franchise and property of any other corpora-
> tion or corporations formed under the laws of any other
> state, for the same purpose that this corporation is organ-
> ized.   Any other such corporation which shall take and ac-
> quire the capital stock, franchise and property of this cor-
> poration shall have all the rights of and be subject to all
> the duties and obligations of this corporation in every par-
> ticular, as provided in this act."

The charter of the New Hampshire corporation contained the
following provision:

> "It shall be the duty of the Connecticut River Power
> Company, at all times, to fully, properly, and efficiently pro-
> tect the railroads, highways, and highway bridges men-
> tioned in this section, and to compensate said railroad cor-
> porations and towns respectively, for all injury or damage
> sustained by them, or either of them, in consequence of the
> construction or operation of any dam, dams, or any other
> work done or structure erected by this corporation."

The railroads there mentioned, one of which is the plaintiff,
are located in this State; the highways are in the towns of Hins-
dale and Chesterfield, New Hampshire, and the highway bridges
are those in the latter towns and three across the Connecticut
River, namely, one between Walpole, New Hampshire, and West-
minster, Vermont, one between Hinsdale, New Hampshire, and
Brattleboro, Vermont, and the other between Chesterfield, New
Hampshire, and Brattleboro, Vermont.

No similar provision appears in the charter of the Vermont
corporation.

The agreement under and by which the consolidation was

effected, after reciting the fact of incorporation of each of the constituent corporations, and the fact that each was given authority under the terms of its charter to merge and consolidate with any other corporation as above set forth, and the fact that both were incorporated for the same purpose, proceeds as follows:

"*Whereas,* both companies deem it advisable to merge and consolidate their capital stock, franchises and property with the object of creating a union of name, stock, business, property, rights, powers and privileges, and hereafter carrying on business as a single corporation so far as consistent with law, but so far as legally may be done without disturbing the legal identity of existence of each corporation so that it may be subject in the respective jurisdictions of Vermont and New Hampshire to the laws of each said states;

*Now, Therefore,* in consideration of the premises and of the mutual covenants and provisions herein contained, it is hereby agreed by and between the parties hereto as follows:

I.    The capital stock, franchises and property of the New Hampshire Company and the Vermont Company are hereby merged and consolidated under the corporate name of 'The Connecticut River Power Company of New Hampshire,' as provided in section II of the amended charter of the Vermont Company and section 10 of the amended charter of the New Hampshire Company and as there provided the consolidated companies shall have all the rights of the New Hampshire Company and of the Vermont Company and be subject to all their duties and obligations and all the rights, franchises, privileges, exemptions, powers, and authorities, and all property, real, personal or mixed of every name and nature heretofore possessed, enjoyed or held by or granted to the New Hampshire Company and the Vermont Company shall be enjoyed and held by the consolidated companies.    It being understood and agreed that the object of this merger and consolidation is to create a union of name, stock, business, officers, property, rights, franchises, powers and privileges, and to hereafter carry on business as a single corporation so far as may be consistent with law, but so far as may be legally done without disturbing the identity of existence of each corporation so that it may be subject in the respective jurisdictions of Vermont and New Hampshire to the laws of each of said states. Whatever may be the legal consequence of the consolidation

herein provided for this agreement is to stand and be effective. This merger and consolidation shall be deemed to be effective upon the execution of this agreement by the officers of said companies and the ratification thereof by the present stockholders.''

Section 2 of the consolidation agreement after providing for the amount and kind of capital stock of the consolidated companies, further provides:

''All shareholders and subscribers to stock in the New Hampshire Company and the Vermont Company shall, upon execution hereof, be deemed to be and shall become common shareholders in the consolidated companies to the same extent and with the same liability as now attaches to them as shareholders in the New Hampshire Company and the Vermont Company, and shall be entitled upon payment in full of any unpaid subscription to one share of common stock in the consolidated companies for each share of stock in the New Hampshire Company or in the Vermont Company. Subscribers for shares in the New Hampshire Company or in the Vermont Company shall be liable to pay to the consolidated companies any and all amounts subscribed for and unpaid for stock of the New Hampshire Company or the Vermont Company.''

Section 3 provides that the office of the consolidated companies shall be at Hinsdale, New Hampshire, where all meetings of the stockholders shall be held, but that ''it'' may also maintain an office and hold meetings at Brattleboro, Vermont, and that the office may be changed from time to time in accordance with the law and the by-laws of the ''company.''

Section 6 provides:

''All obligations of the New Hampshire Company and of the Vermont Company are assumed by the consolidated companies.''

This agreement was duly executed on the 7th day of June, 1907, and no question is made but that it became effective immediately, and has ever since been fully recognized and acted upon by all parties and persons affected thereby.

The first question for review is whether the court erred in excluding the charter of the New Hampshire corporation and the consolidation agreement which were offered as tending to show liability of defendant for the injuries complained of. This depends, of course, upon whether the provision of the charter of the New Hampshire corporation above quoted imposes a lia-

bility upon defendant that can be availed of in this suit. If it does, both instruments should have been admitted for the purpose for which they were offered; if it does not, the ruling must stand. The defendant stoutly insists that it does not, for the reasons: (1) That the defendant for the purpose of this action must be considered a Vermont corporation and that neither state "can act extraterritorially upon the creature of the other;" and (2) that, since the alleged injuries were caused in this State, the laws of this State must govern, and that to give force to the New Hampshire charter would offend the doctrine relating to the conflict of law.

[1-5] We are satisfied that according to the weight of authority the new corporate entity which is brought into existence by the consolidation of two or more constituent corporations under the authority of the law of the states creating them constitutes a new corporation possessed of all necessary corporate attributes (*Ohio & Miss. Ry. Co.*, v. *People*, 123 Ill. 467, 14 N. E. 874; *Railway Co.* v. *Berry*, 113 U. S. 465, 28 L. ed. 1055, 5 Sup. Ct. 529; *Shields* v. *Ohio*, 95 U. S. 319, 24 L. ed. 357; *Graham* v. *Railroad Co.*, 118 U. S. 161, 30 L. ed. 196, 6 Sup. Ct. 1009; *Bridge Co.* v. *Mayer*, 31 Ohio St. 317; *Bishop* v. *Brainerd*, 28 Conn. 289; *Leavenworth County Comm.* v. *Chicago, etc., R. R. Co.*, 134 U. S. 688, 33 L. ed. 1064, 10 Sup. Ct. 708; *Atty. General* v. *N. Y., N. H., & H. R. R. Co*,. 198 Mass. 413, 417, 84 N. E, 737; *Smith* v. *Cleveland, etc., R. R. Co.*, 170 Ind. 382, 81 N. E. 501; *State* v. *Keokuk, etc., Ry. Co.*, 99 Mo. 30, 12 S. W. 290, 6 L. R. A. 222). That such was the result contemplated in the instant case, both by the consolidation provision in the charter of each constituent corporation and by the consolidation agreement made pursuant to those provisions cannot be doubted; and we entertain no doubt that such was the result effected. There being no statute to the contrary, the stockholders, directors, and officers of such a corporation can hold meetings and transact business in each state concerned in its creation so as to bind the corporation and its property everywhere. *Ohio & Miss. Ry. Co.* v. *People, supra; Fitzgerald* v. *Missouri Pac. Ry. Co.* (C. C.), 45 Fed. 817; *Graham* v. *Railroad Co., supra.* Such corporation is responsible as a unit for the acts and neglects of itself or its agents and servants (*Providence Coal Co.* v. *Providence, etc., Ry. Co.*, 15 R. I. 303, 4 Atl. 394; *Southern Ry. Co.* v. *Bouknight*, 70 Fed. 442, 17 C. C. A. 181, 30 L. R. A. 823); it is a citizen of each

state for the purpose of jurisdiction (*Horne* v. *Boston & Maine R. R.* [C. C.], 18 Fed. 50) ; process is to be served upon it as upon a domestic corporation in the state where suit is brought (*In re St. Paul, etc., Ry. Co.*, 36 Minn. 85, 30 N. W. 432) ; and a judgment rendered against it by a court having jurisdiction will bind it everywhere. *Union Trust Co.* v. *Rochester, etc., Ry. Co.* (C. C.), 29 Fed. 509 ; *Muller* v. *Dows,* 94 U. S. 444, 24 L. ed. 207.

[6]    How far, if at all, the constituent corporations continue to exist and how far, if at all, the charter powers and limitations granted and imposed in one state follow the consolidated corporation into the other are questions we do not find it necessary to discuss.   It is enough for our present purpose to hold that the consolidated corporation in New Hampshire, at least, has all the rights and is subject to all the liabilities specified in the charter granted by that state, and in Vermont, at least, has all the rights and is subject to all the liabilities specified in the charter granted by that state.   In each state, however, it acts and is answerable for its acts as a new corporation possessed of all essential corporate attributes.

[7, 8]    Its legal status is unaffected by the provision in the consolidation agreement relating to the continued identity of existence of the constituent corporations, since this would have continued for the purposes there specified without such agreement.   Nor is the fact that the new corporate entity is designated in some parts of the consolidation agreement as the consolidated "companies" of any particular significance, since in other parts of the agreement it is referred to in the singular as "it" and "company."   The evident intention was to create a new corporation of the character we hold was created by the agreement entered into.

[9, 10]    The acts which caused the injuries complained of were committed by the defendant as a new corporate entity, and not by the constituent corporations of which it is composed. They were committed by it in the prosecution of an enterprise which extended into both states and was of such a character as to necessarily constitute a single, indivisible whole, and acts done in respect thereto were necessarily done as a whole, and were inseparable by the boundary line between the two states.   Such acts may be treated, therefore, as having been committed wholly in either state.   For the purpose of this case we treat them as

having been committed wholly in New Hampshire. The charter granted by the legislature of that state provided in express terms that if the corporation in the exercise of the authority thereby conferred injured property situate either in that state or in this it should make compensation therefor. The defendant accepted that charter which, with the Vermont charter, constituted its sole authority to pond the water of the Connecticut River, and when it accepted it the obligation to make compensation for injuries resulting in either state from its acts became binding and obligatory upon it as an inseparable part of the law of its being. That the defendant would be liable under this charter provision in New Hampshire for injuries resulting in that state from its acts we entertain no doubt; and we think it equally clear that it would be liable in a suit brought in that state to recover for injuries resulting in this State. It is not a question of giving extraterritorial effect to the laws of New Hampshire, or of conflict between the laws of that state and this, but rather of enforcing in that state an express, positive charter obligation imposed upon the defendant by the Legislature of that state, which it became bound to perform when it accepted that charter.

In so far as the New Hampshire charter provided for compensation for injuries to property in this State, it differs from any other charter ever before the courts, so far as we are aware. But we see no legal objection to the legislature of that state making such a provision if it saw fit to do so. The promotors of the scheme were seeking authority to prosecute a work in that state which its legislature foresaw might result in injury to the people of this State as well as its own. It had the power to grant or to withhold such authority, or to grant it with such conditions and limitations attached as it deemed proper in the circumstances. What it deemed proper is evidenced by the provision in question. Neither the incorporators nor the defendant were obliged to accept the charter impressed with this burden, but both did; and the defendant having availed itself of all the rights and privileges thereby conferred cannot now escape the liability thereby imposed on the ground that neither the Vermont charter nor the laws of this State imposed a like burden. The defendant's liability, in the courts of New Hampshire at least, grows out of, and is fixed by, the terms of the charter which the legislature of that state granted it, and is wholly un-

affected by what the legislature of any other state has done, or failed to do.

[11]    It is unnecessary, however, in the circumstances, for the plaintiff to go into the courts of that state to get the benefit of this charter provision, since assuming, but not deciding, that an action predicated on such provision is local in character, the instant case falls within a well-recognized exception to the rule governing the situs of local actions, namely, that when an act is committed in one jurisdiction that causes injury to real property in another an action for such injuries may be brought in either. The earliest utterance on this subject, found by us, is in Bulwer's Case, 7 Coke I, where it is said: "If a man doth not repair a wall in Essex, which he is bound to repair, whereby my land in Middlesex is drowned, I may bring my action in Essex, for there is the default, as is adjudged in 7 Hen. IV pl. 8, or I may bring it in Middlesex, for there I have the damage." Mr. Chitty in his work on Pleadings, Vol. I *p. 271, says: "Where, however, an injury has been committed in one county to land, etc., situate in another, or whenever the action is founded upon two or more material facts which took place in different counties, the *venue* may be laid in either." Mr. Gould says: "If however, a tortious act, committed in one county, occasions damage to land or any other subject, situate in another, an action for the injury thus occasioned may be laid in either of the two counties, at the choice of the party injured. Thus if by the diversion or obstruction of a water course, in the county of A., damage is done to land, mills or other property in the county of B., the party injured may lay his action, in either of those two counties." Gould pl., p. 105, § 108. Mr. Wharton, in his Conflict of Laws, Vol. I, p. 667, says: "In any event, there is an exception to the rule when an act is done in one jurisdiction which causes injury to real property in another; in such a case, according to the weight of authority, the action may be brought in either jurisdiction." Among the cases following the rule laid down by these eminent authors are: *Smith* v. *Southern Ry. Co.,* 136 Ky. 163, 123 S. W. 678, 26 L. R. A. (N. S.) 927; *Manville Co.* v. *City of Worcester,* 138 Mass. 89, 52 A. R. 261; *Barden* v. *Crocker,* 10 Pick. (Mass.) 383; *Thayer* v. *Brooks,* 17 Ohio, 489, 49 A. D. 474; *Deseret Irr. Co.* v. *McIntyre,* 16 Utah 398, 52 Pac. 628; and *Rundle* v. *Del. & R. Co.,* 21 Fed. Cas. No. 12139.

[12]    As already seen, the court has jurisdiction of the

parties in this case; and that it has jurisdiction of the subject-matter cannot be doubted.  *Massucco* v. *Tomassi*, 80 Vt. 186, 67 Atl. 551; *O'Brien* v. *People*, 216 Ill. 354, 75 N. E. 108, 108 A. S. R. 219, 3 Ann. Cas. 966; *St. Louis & San Francisco R. R. Co.* v. *Lowder*, 138 Mo. 533, 39 S. W. 799, 60 A. S. R. 565; *Dowdy* v. *Wamble*, 110 Mo. 280, 19 S. W. 489; *Crutcher* v. *Block*, 19 Okla. 246, 91 Pac. 895, 14 Ann. Cas. 1029.

The question of "contractual assumption," to quote from defendant's brief, is not involved.  The obligation which devolved upon defendant when it accepted the New Hampshire charter to carry out the provision in question is not to be regarded in the light, simply, of a private stipulation between defendant and the state of New Hampshire affecting them and their privies alone, but must be treated and construed as a charter provision binding and obligatory upon the defendant as an inseparable part of the law of its being.  *Welch* v. *First Div. St. P., etc., Ry. Co.*, 25 Minn. 314.

[13]  We think what we have said sufficiently covers the claims concerning the admissibility of the New Hampshire charter and the consolidation agreement on the question of liability.  Our conclusions, in brief, are that the liability imposed by the New Hampshire charter could be enforced by the plaintiff in the courts of that state, and that for the reasons pointed out it may, likewise, be enforced in our courts.  It follows that the exclusion of the two instruments for the purpose above mentioned was error.

The plaintiff introduced in evidence, without objection, an agreement in writing between it and the Connecticut River Railroad Company, under date of July 1, 1880.  This instrument is designated by the parties thereto as an "Operating Contract," and is to continue in force for fifty years from its date.  The material provisions thereof are as follows:

"The said Connecticut River Railroad Company agrees:

First:—To furnish to the Vermont Valley Railroad Company of 1871, so many freight and passenger cars and locomotives as may be needed by said Vermont Valley Railroad Company to transact the business coming to it in excess of the supply furnished by the Vermont Valley Railroad Company's rolling stock on hand, free of all charge except for use.

Second:—To pay all necessary expenses for operating said road; to keep the same and its equipment in good re-

pair; to pay all taxes, the insurance, and to save the said road harmless from all accidents and claims for injuries and damages, resulting from the operation of the road.

Third:—That there shall be charged only the sum of seven hundred and fifty dollars semi-annually to the operating expenses, to pay the salaries of the officers appointed under this contract, including Freight Agent, Ticket Agent, and other general officers and office rent for said officers.

If, however, the gross earning of the road should increase, the salaries of said officers may, at the option of the Connecticut River Railroad be increased in like proportion.

The Vermont Valley Railroad Company of 1871 agrees,

First:—To operate and manage their said road in the interest of the Connecticut River line, to preserve their organization, and in all respects to conform to the laws of the State of Vermont. Injuries to the roadbed and track, by act of God, or unavoidable casualties, and damage to depots by fire and from other causes than carelessness on the part of officers or employees using the said property, shall be made good by the Vermont Valley Railroad Company of 1871.

Second:—To appoint as the Superintendent of their said road, some person nominated by the Connecticut River Railroad Company who, while acting as such Superintendent, shall have the exclusive control of the management of the machinery of said road, the movement of trains, the right to employ or dismiss, at his will, the employees of said road, and to make such ordinary repairs on said road and its depot property as he shall judge expedient. He shall also have power to make rates for fare and freight over said road; but said Vermont Valley Railroad shall in no case receive less than a pro-rata proportion of the receipts on all joint business over its road. And said Superintendent shall at all times be responsible to the Directors of the Vermont Valley Railroad of 1871, and subject to removal by them.

Third:—To appoint an Assistant Treasurer, to be nominated by the Connecticut River Railroad Company, who shall, at all times as he may request, receive the earnings of the Vermont Valley Railroad, and who shall be accountable for the same.

Fourth:—To appoint a pay-master of said road, to be nominated by the Connecticut River Railroad Company, who shall keep a correct account of the business of said road.

Fifth:—After deducting from the gross earnings of the Vermont Valley Railroad of 1871 from all sources semi-annually on the first day of January and July in each year the sum of Twenty Thousand Dollars ($20,000) and the net earnings above that sum, to pay over to the Connecticut River Railroad Company the balance of said earnings, retaining however Five Hundred Dollars semi-annually for paying the expenses of maintaining the organization of the Vermont Valley Railroad Company of 1871. The term net earnings is defined to be that part of the gross receipts or earnings which remains after paying taxes and insurance and all ordinary expenses, including car service, for operating and maintaining said road in good repair and condition for use, and for adding such improvements thereto as a wise and economical management may require.''

The plaintiff also introduced, without objection, a lease from the Connecticut River Railroad Company to the Boston & Maine Railroad, under date of January 1, 1893, for the term of ninety-nine years. Under the terms of this lease, as we understand the situation, and no claim has been made to the contrary, the Boston & Maine Railroad stepped into the shoes, so speak, of the Connecticut River Railroad Company under the so-called ''Operating Contract.'' In other words, for the purpose of the question presently to be considered, the Boston & Maine Railroad stood in precisely the same position respecting the Vermont Valley Railroad Company, this plaintiff, as the Connecticut River Railroad Company stood under that contract. The plaintiff then offered to show by one Harvey, and others, and by the original vouchers, records, train sheets, etc., the amount expended by the Boston & Maine Railroad in repairing the damage occasioned to plaintiff's track and roadbed by the alleged acts of defendant, and in taking care of plaintiff's business during the time such repairs were being made, and further offered to show in the same connection that ''in the half yearly period covered by this occurrence, that is in the half yearly period beginning on January first, 1920,'' the gross earnings of plaintiff were sufficient to pay $20,000 and $500 and all expenses and charges incurred by the Boston & Maine Railroad on behalf of the Vermont Valley Railroad Company on any account for which the latter company was liable, and that the fund out of which it was paid was the gross earnings of the Vermont Valley Company, from

which it had to be taken.    This evidence was excluded and the plaintiff had an exception.

The grounds upon which this evidence was claimed to be admissible were that if the injuries resulted from unavoidable casualty they were covered by the express provision of the operating agreement, and that if they did not result from unavoidable casualty they were such that the plaintiff was obliged to reimburse the Boston & Maine Railroad for them under the last provision of the contract above quoted, and, therefore, the damage was to the plaintiff.    The grounds of objection to its admission were that it had no tendency to show damage to plaintiff as appears from the operating contract and lease; that the amount it may have cost the Boston & Maine Railroad to make the repairs was immaterial upon the question of damages suffered by plaintiff, and that under the operating contract and lease the offered evidence as to the expense incurred by the Boston & Maine Railroad was irrelevant to the issue in this case.

The first question for consideration is whether under the provisions of the operating contract plaintiff's status to the injuries sustained was such that it can recover in this suit, and that depends upon which party, under the terms of said contract, must ultimately bear the loss resulting from such injuries.

It must be admitted that the contract is a model, if obscurity of meaning was the object sought by the parties thereto; but when carefully analyzed it is, in effect, this:    The Connecticut River Company was to furnish all necessary rolling stock free of charge except for use; pay all necessary expenses of operating the road, including taxes, insurance, and damages occasioned by accidents or other injuries resulting from such operation, and keep the road and its equipment in good repair.    Its charge for operating expense, so far as it related to the salaries of certain officers, and office rent, was limited to $750 semi-annually.    The Vermont Valley Company was to preserve its organization, operate, and manage the road in the interest of the Connecticut River Company through the aid and assistance, largely, of officers to be nominated by the latter company, bear the expense of any damage occasioned to the roadbed and track by act of God or unavoidable casualty, etc., and account for the earnings of the road in the manner provided by the last section of the contract.    The effect of that section was this:    The Vermont Valley road was to receive, semi-annually, out of the gross earn-

ings $20,000 plus $500 for expense of maintaining its organization and what remained, if anything, after paying taxes, insurance, and all ordinary expenses, including car service, for operating and maintaining said road in good repair and condition for use, and for adding such improvements, etc., expenses which were to be borne by the Connecticut River Company in the first instance.   In other words, the Vermont Valley Company was to deduct from the gross earnings of the road, semi-annually, $20,000 and $500 for expense of keeping up its organization. Those two items were to be preferred over all others and must be paid if the gross earnings of the road are sufficient for that purpose.   If such earnings are not sufficient for that purpose, the shortage falls on the Vermont Valley Company, since it can look only to the, gross earnings for satisfaction of those items; and in that event, all operating expenses fall, of course, on the Connecticut River Company.   If, however, the gross earnings are more than enough to pay the $20,500, semi-annually, all above that amount, so far as may be necessary, is to be used to reimburse the Connecticut River Company for its expenditures on account of "taxes, insurance and all ordinary expenses, including car service, for operating and maintaining said road' in good repair and condition for use," etc., and when those items are taken care of what is left, if anything, belongs to the Vermont Valley Company.

[14-16]   There is no escape from the conclusion that under this contract the damages shown in this case fall, ultimately, on the plaintiff.   If they were occasioned by the act of God or unavoidable casualty, within the meaning of that phrase so used (a question that cannot be ruled as a matter of law on the evidence before us), it cannot recover; if they were not it can recover, since it is in reality the party who sustained the injury.   The fact that as between it and the Connecticut River Company or the Boston & Maine Railroad, the latter was required to make the repairs, and has made them, is immaterial, since the fact remains that the plaintiff was bound to reimburse the Boston & Maine Railroad therefor so far as the earnings of the road were sufficient for that purpose; and the offer in part was, in effect, to show that the earnings were adequate to cover all expenditures made by the Boston & Maine Railroad in this behalf as well as the ordinary operating expenses.   Manifestly, the plaintiff, and not the Boston & Maine Railroad, is the party who sus-

tains the injury, and consequently it can recover therefor. See *Parish* v. *Baird et al.,* 160 N. Y. 302, 54 N. E. 724. Without taking time or space to notice all the suggestions made concerning this question, it is enough to say that they have all been considered, and we are satisfied that this evidence was improperly excluded. While it may be that what the Boston & Maine Railroad expended for repairs, etc., is not the basis for plaintiff's recovery (a question not raised or decided), proof of such expenditures was evidence tending to show the extent of plaintiff's damages resulting from defendant's acts.

The remaining exception is to the granting of defendant's motion for a directed verdict. This motion, of course, was addressed to the situation presented by the evidence then in the case—the New Hampshire charter, the consolidation agreement, and the evidence of damages having been excluded. Since the disposition of the questions presented by the other exceptions necessitates a retrial on which the situation will obviously be so different from that presented when the motion was granted, and since most, if not all, of the questions raised by this exception will be eliminated when the excluded evidence is before the court, we do not express our views concerning any of these questions.

*Judgment reversed and cause remanded.*